SKELLIE *vs.* JAMES.

81  419
90  772
81  419
93  653
81  419
e123  12

1. In a contest between creditors of the husband on the one hand, and the wife on the other, where a fraud is charged, and where the wife sets up a secret contract between herself and husband, the jury should be instructed to scan the transaction closely, and that the *bona fides* thereof must be clearly established. It is error to charge that the only difference between transactions between a husband and wife and those between him and third parties is, that the law requires that the former "should, perhaps, be looked into a little more closely" than the latter.

(a) The facts of this case show that it is one in which the jury should have had positive and stringent instructions in regard to their scrutiny of the conduct of the husband and wife.

2. In order to render an attorney incompetent to testify, under the act of 1887, (acts, p. 30,) he must have acquired his knowledge from his client by virtue of his relations as attorney, or by reason of the anticipated employment of him as such. If he acquired the knowledge in any other manner, he is both competent and compellable to testify.

January 23, 1889.

Husband and wife. *Bona fides.* Witness. Attorney and client. Before Judge GUSTIN. Houston superior court. April term, 1888.

A *fi. fa.* in favor of T. O. Skellie, issued on judgment rendered October 8th, 1886, against J. B. James,

was levied on certain land, which was claimed by Mary James, wife of the defendant in *fi. fa.* On the trial, the claimant introduced a deed executed October 3, 1884, by which her husband conveyed to her the land in question, amounting to 350 acres, the consideration of the conveyance being $2,275 paid by Mrs. James (part of her separate estate) and the assumption by her of a certain mortgage for $2,500 with interest, held as an encumbrance on the land. This conveyance was attacked by plaintiff both for inadequacy of consideration and fraud. Plaintiff showed that there was a good dwelling-house of six or seven rooms upon part of the land, besides out-houses and an orchard; and witnesses for the plaintiff estimated the value of the land, including improvements, at from $15 to $20 an acre. Upon the other hand, the evidence for the claimant tended to show that the consideration mentioned in the deed was a fair price for the land and improvements; that though when defendant in *fi. fa.* purchased it two or three years before he sold it to his wife, he had paid a higher price for it than that for which he did sell it to her, he endeavored to sell the lands or part of the lands he sold to her at as low or a lower price than he finally did sell them for to his wife.

The testimony for the claimant further showed that the defendant was indebted to her, at the time of the execution of the deed, in a larger amount than the amount which was recited as the sum paid by her, exclusive of the assumption of the mortgage; and it was shown that the mortgage was afterwards paid by her. The manner in which the indebtedness of the defendant in *fi. fa.* to his wife arose, was as follows : In the spring of 1868, she loaned him $50. In the latter part of that year, he borrowed $30 from her. About the same time or a little later, she inherited from her mother $100,

which defendant also borrowed, and in 1870 he borrowed $500 of her money which she had inherited from the estate of Wiley Barron. This money he agreed to pay interest on, and she allowed him to use it in trading. He did so use it in the purchase of real estate and stock, taking the titles of the various pieces of realty bought and sold in his own name, with her knowledge and consent, and realizing profits therefrom, which they agreed she should have the benefit of, and in this way, at the time he bought the land in question and other lands, part of the same place, he had accumulated for her a considerable sum of money, which was invested in these lands. This money so invested and other moneys which he had borrowed, represented at least partly by the mortgage mentioned, went to make up what he had paid for the lands. He and his wife both swore positively that, at the time he made her the deed, he was indebted to her far in excess of the amount stated in the deed as having been paid by her, and this amount so paid was credited on the amount of his indebtedness to her; they also swore that when her funds were not invested he was to pay her interest on them (banking interest his wife stated), and when they were invested she was to receive profits. The defendant in *fi. fa.* also testified that when he made this sale to his wife, although he shortly afterwards conveyed to her all the stock, household furniture, and other visible property that he had, in his opinion he still had remaining enough property in the shape of notes, etc. to pay his debts. He did not specify what was the amount or character of the notes, etc.; and the plaintiff showed that he was indebted at the time to the extent of several thousand dollars. The bill of sale of stock, etc. was executed on the 4th day of May, 1885, and recites a consideration of $1,688 paid for said defendant by his wife

to one Collier, said amount having been paid by Collier for defendant on an execution against defendant and others.

During the course of the trial, A. L. Miller, Esq., was put upon the stand by the plaintiff, and stated that, as a loan negotiator, he negotiated loans on the place about the time of the transfer by the defendant to his wife. He was asked by plaintiff's counsel what was the amount of the loan negotiated; he answered that he did not care to go into this, as it was a private matter between his firm and their clients, (Miller being a member of the firm of Duncan & Miller, claimant's attorneys.) The court would not require him to answer the question. He was also asked whether or not he knew any estimate put by Mrs. James on this place in 1884. The court stated, "You can ask that question if it came to Mr. Miller in a way which does not come within the rule"; and the witness stated that it came within the scope of his confidential relations with Mrs. James as an attorney at the time. He was then asked whether he was consulted as an attorney or employed as an agent to make certain loans. He replied, "Both ways." He further stated that, until the last week, he had never said a word to Mrs. James, that her application was taken through the office of his firm, that he thought it was written up by him and signed by Mrs. James, that he had advised, not directly through her, but through her husband; and he declined to answer. It appeared that the debt of James to the plaintiff, which was the foundation of the judgment in this case, was made in 1883.

The jury found for the claimant. The plaintiff moved for a new trial on the grounds that the verdict was contrary to law and evidence; because of error in the court's charge, and in his refusal to charge as requested

by plaintiff; and because he would not require Miller to testify as to any admissions made to him by claimant as to the value of the land in controversy. The motion was overruled, and the plaintiff excepted.

H. A. Mathews, for plaintiff.

Duncan & Miller, by brief, for defendant.

Simmons, Justice.

An execution in favor of Skellie was levied on certain lands, which were claimed by Mary James, the wife of the defendant in execution. On the trial of the case, the jury, under the charge of the court, returned a verdict for the claimant. The plaintiff made a motion for a new trial on several grounds, which was overruled by the court, and he excepted. The facts will be found in the official report of the case.

1. One of the grounds taken in the motion for a new trial was the following: (8) Error in charging as follows: "When the jury shall have clearly satisfied themselves that such a debt (any actual debt) existed, then that debt will stand on the same footing as any debt that the husband may owe to anybody else. It would be just as good a consideration between the husband and wife as it would be between him and any other outside party. The only difference is, that the law requires it should, perhaps, be looked into a little more closely."

We think the court should have granted a new trial upon this ground. After charging that the husband and wife had a right to make contracts, one with the other, and the contracts would be good between them, he added, "The only difference is, that the law requires it should perhaps be looked into a little more closely." We think, on the contrary, that in a con-

test between creditors of the husband on the one hand, and the wife on the other, where a fraud is charged, and where the wife sets up a secret contract between herself and her husband, as was done in this case, the jury should be instructed to scan the transaction closely, and that the *bona fides* thereof must be clearly established, and not that "perhaps" they might look into it "a little more closely."

If there ever was a case in which the jury should have had positive and stringent instructions in regard to their scrutiny of the conduct of the husband and wife, this is such a case.   It seems to us that the evidence in this record discloses that this pretended contract was made for the deliberate purpose of defrauding creditors.    It is claimed by the husband and wife that, in the year 1868, he borrowed from her $180, and in 1870, he borrowed $500.    The contract between them was that he was to speculate in this property, and when he bought the land he was to take the title in his own name, and when he bought personal property he was to do the same, and all the profits he made were to be hers, and all the losses were to be his.    He was also to pay her interest on the money, he claiming that the rate of interest he was to pay her was twelve and a half per cent., and she claiming that it was seven per cent. Between the time he borrowed the money and the time he made this deed to his wife, under which she claimed this land, $680 had increased to more than $4,000.  The taking of these titles in his own name enabled him to obtain credit, and perhaps Skellie, this plaintiff, sold him goods on the faith of this very property to which he had the title, and which he transferred to his wife after incurring this debt to Skellie.   We think, therefore, that under this state of facts, the judge should not have qualified the rule above referred to, but should

have instructed the jury to closely examine the transaction, and should have further instructed that the *bona fides* of these transactions must be clearly established. For a fair and full discussion of this principle, see the case of *Booher vs. Worrill*, 57 *Ga.* 235.

2. It is also claimed, in the motion for a new trial, that the court refused to compel counsel for the claimant to testify in the case. We hardly think that the counsel, when he declined to testify, brought himself within the provisions of the act of 1887 (acts 1887, p. 30.) He did not say that he acquired the knowledge from his client by virtue of his relations as attorney, or by reason of the anticipated employment of him as attorney. In order to render him incompetent to testify under this act, he must have acquired his knowledge from his client by virtue of his relations as attorney, or by reason of the anticipated employment of him as attorney. If he acquires the knowledge in any other manner, he is both competent and compellable to testify.

Judgment reversed.